**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 28, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ROBYN CAGLE, as primary
beneficiary of the Structured
Settlement Annuity of Shavon R.
Norris,

        Plaintiff-Counter-
        Defendant-Appellant,

v.

THE JAMES STREET GROUP;
CLAYTON A. CLARK; CLARK
DEPEW & TRACEY LTD., LLP;
SHELLEY V. HUTSON; THE
HUTSON LAW FIRM,

        Defendants-Appellees,

    and

MASS MUTUAL ASSIGNMENT
COMPANY; CHELSEI COSGROVE,

        Defendants,

    and

MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY,

        Defendant-Counter-
        Claimant,

    and

No. 09-6262
(D.C. No. 5:07-CV-00029-D)
(W.D. Okla.)

WYETH CORPORATION,

       Defendant-Interpleader,

------------------------------

CATHERINE GARLAND,

       Intervenor-Interpleader,

   and

SHERRY GOLDEN, SAMANTHA COSGROVE,

       Intervenors-Plaintiffs.

## ORDER AND JUDGMENT[*]

Before **HARTZ**, **ANDERSON**, and **O'BRIEN**, Circuit Judges.

Robyn Cagle appeals from the dismissal of her claims against attorneys and an insurance broker. She sought damages based upon the defendants' alleged failure to timely finalize the paperwork for an annuity contract purchased by her

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

since deceased same sex partner, Shavon Norris, naming Cagle as beneficiary. The district court entered summary judgment in favor of the defendants.

Cagle's claims against the attorneys turn on choice of law principles. As the district court properly concluded, under the applicable state law, in this case that of Texas, the attorneys had no duty to Cagle under either tort or contract principles. As to the claims against the insurance broker the court held she failed to establish the breach of any legally-cognizable duty to her. We affirm.

**BACKGROUND**

Prior to her death, Norris was Cagle's same-sex life partner; they lived together in Oklahoma. In 1996, Norris obtained a prescription for and used fenfluramine (Pondimin) and phentermine (together known popularly as "fen phen"), diet drugs manufactured by the Wyeth Corporation (Wyeth). After taking the drugs, she developed severe pulmonary arterial hypertension, an uncurable, life-threatening condition.

Norris was diagnosed with pulmonary hypertension in the summer of 2004. In October or November of that year, defendant Shelly V. Hutson, a Texas attorney, traveled to Oklahoma to discuss with Norris the "fen phen" litigation against Wyeth. Norris agreed to join in the litigation and employed Hutson, Hutson's firm (the Hutson law firm), and Clayton A. Clark and his firm (Clark, Depew & Tracey, Ltd., L.L.P.) (collectively, the "Lawyer Defendants"), to represent her in litigation against Wyeth.

-3-

In early 2006, after filing suit against Wyeth, the Lawyer Defendants verbally settled Norris's fen phen claim. On June 14, 2006, Hutson met with Norris at an Oklahoma City hotel to obtain her agreement to the settlement. Cagle also attended the meeting. During the meeting, Hutson suggested some of the settlement proceeds be used to purchase a structured settlement annuity. Hutson referred them to defendant The James Street Group (TJSG), a Texas insurance broker, for the purpose of purchasing such an annuity.

A key purpose of the annuity, which included a number of large annual payments as well as smaller monthly payments, was to help defray Norris's anticipated medical expenses. As part of the treatment of her condition, Norris was obligated to purchase expensive medicines on an ongoing basis. She was also a potential candidate for a lung transplant, a very expensive procedure.

Cagle and Norris contacted Jeanie McIntyre of TJSG. McIntyre provided them with a number of rate quotes and illustrations of annuity policies from various companies. In calculating annuity benefits, these companies "rated" Norris in terms of her remaining life expectancy. None of them rated her condition as immediately fatal.

On June 28, 2006, Norris notified McIntyre of her desire to purchase a MassMutual annuity. On the same day, the Lawyer Defendants signed a settlement agreement with Wyeth under Rule 11 of the Texas Rules of Civil Procedure. Two days later, by email, McIntyre supplied the Lawyer Defendants

with wire transfer instructions for funding the annuity. At some point, Norris instructed McIntyre the annuity should identify Cagle as the beneficiary of its required payments in the event of Norris's death.

As directed, Wyeth disbursed $3 million of Norris's settlement funds to MassMutual to purchase the annuity. In order to complete the paperwork for issuance of the annuity policy, MassMutual required Norris or her agents to furnish two additional documents: an Addendum to the Confidential Release, Indemnity and Assignment (Addendum) Norris had previously signed, and a Uniform Qualified Assignment and Release (UQAR) signed by Wyeth, MassMutual, and Norris. *See* Aplt. App., Vol. V at 2037-40.

On July 3, 2006, McIntyre drafted a letter to Norris at her address in El Reno, Oklahoma, enclosing the Addendum and the UQAR for her signature. But she did not send it. Instead, she contacted Clark to obtain his approval of the Addendum and UQAR before sending them to Norris.

The Lawyer Defendants approved these documents by email on July 7, 2006, but did not give McIntyre permission to immediately send them to Norris for signature. Clark's legal assistant sent an email to McIntyre, stating the attorneys had reviewed the documents but "have decided to wait and take care of it after the money comes in." *Id.*, Vol. VII at 2795. The legal assistant then asked "Will that be a problem?" *Id.*

McIntyre responded it was fine with her and she would "just send the [A]ddendum and [UQAR] to all the parties when [the annuity] funds." *Id.* Attorney Clark later explained he did not want the UQAR sent to Norris for signature until MassMutual made its first scheduled periodic payment on the annuity.[1] Knowing the UQAR released Wyeth from its obligation to make the periodic payments, he did not want to take the risk having the signed UQAR provided to Wyeth before MassMutual began making payments.

The Lawyer Defendants did not inform Norris or Cagle, however, that the Addendum and UQAR were part of the paperwork for issuance of the annuity policy. Nor did they tell either Norris or Cagle they had instructed TJSG to hold these documents until after funding. But the Lawyer Defendants did accede to McIntyre's request that TJSG at least be allowed to submit the application information so MassMutual would begin making annuity payments to Norris and to "reassure them and make them comfortable that their benefits are locked and they are all set up." *Id.* at 2795, 2865.

---

[1] Clark's concerns arise from a wrinkle of the Internal Revenue laws concerning settlement proceeds. In order to permit a third party to assume liability for periodic payment of tax-free personal injury liability proceeds, a qualified assignment is made to the assignee, the entity assuming liability for such periodic payments. 26 U.S.C. § 130(c). The qualified assignment allows the payor/assignor to remove the payment obligation from its books. The obligation is then transferred to the assignee. As part of the transaction, the claimant (in this case, Norris) releases the assignor from all liability for the periodic payments.

MassMutual made its first payment to Norris under the annuity contract on September 1, 2006. The payment was deposited directly to a joint checking account Norris shared with Cagle. On September 7, McIntyre again asked the attorneys if she could send the Addendum and UQAR to Norris for her signature. On September 11, 2006, the Lawyer Defendants finally informed McIntyre via email she could send these documents to Norris.

In the interim, Norris and Cagle moved from El Reno, Oklahoma, to a new home in Edmond, Oklahoma, which they purchased with a portion of the Wyeth settlement proceeds. They notified the United States Post Office of their change of address, but not the Lawyer Defendants or TJSG.

On September 12, 2006, TJSG sent the Addendum and UQAR via second-day United Parcel Service (UPS) to Norris at her prior address in El Reno. UPS left the package containing the documents at the front door of the El Reno address on September 15. The documents never made it to Norris for signature.

Norris unexpectedly entered the hospital on September 15, 2006. She remained there until her death two weeks later on September 28. According to Cagle, on September 19, she contacted TJSG to verify the paperwork for the annuity was complete, and an unidentified person with TJSG told her it was.

After Norris's death, MassMutual stopped making monthly payments and reversed a payment it had made on September 29, 2006. TJSG attempted to get MassMutual to issue the annuity policy, but MassMutual refused to issue the

-7-

policy or to make any further payments to Cagle. It justified this refusal on incomplete paperwork – Norris had not executed the Addendum prior to her death. MassMutual was also concerned because Catherine L. Garland, the administrator of Norris's estate, who filed an Oklahoma probate proceeding in January 2007, was asserting the policy proceeds should be part of Norris's estate.

Cagle subsequently filed a declaratory judgment lawsuit against MassMutual; it forms the basis of this appeal. She sought a declaratory judgment that the policy had been validly issued prior to Norris's death and Cagle was entitled to the policy benefits. Her complaint also included claims for breach of contract and negligence against the Lawyer Defendants and TJSG. She contended they improperly failed to take necessary steps to have the policy issued prior to Norris's death. MassMutual filed an interpleader counterclaim, adding Garland and Wyeth as interpleader counterclaim defendants. Norris's sisters, who along with Garland claimed an interest in the annuity contract in derogation of Cagle's, were later added to the suit.

The district court granted Cagle's initial motion for partial summary judgment, concluding the annuity was valid and enforceable prior to Norris's death. It then decided Cagle's claim against TJSG and the Lawyer Defendants (their action or inaction delayed Norris's execution of the documents and therefore deprived Cagle of the annuity proceeds) was moot in light of its earlier

ruling that the annuity was valid and enforceable. It granted partial summary judgment to TJSG and the Lawyer Defendants on this claim.

The declaratory ruling did not exhaust Cagle's claims against these defendants, however. She also argued their breach of contract and/or negligence required her to sue to enforce her rights as beneficiary of the annuity and she was entitled to damages consisting of her attorney's fees and other expenses (which eventually included the amounts she paid to settle with Norris's estate). As to these damage claims, the district court found Cagle failed to show either TJSG or the Lawyer Defendants breached any duty owed to her, whether tort or contract. Cagle subsequently settled with all remaining defendants. She then appealed from the district court's order granting summary judgment to TJSG and the Lawyer Defendants.

## ANALYSIS

### 1. Standard of Review

We review a district court's grant of summary judgment de novo, applying the same standard as the district court." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1322 (10th Cir. 2008).[2] We view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1223 (10th Cir. 2008). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on

---

[2]     Our recitation of the facts effects this view.

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ .P. 56(c). "An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way" and "[a]n issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal quotation marks omitted).

## 2. Claims Against Lawyer Defendants

### A. Choice of Law

Cagle asserted claims against the Lawyer Defendants and TJSG for breach of contract and negligence. The district court, apparently looking to the attorney's fees she incurred in bringing this action, focused its analysis on the recoverability of attorney's fees under Oklahoma law.[3] This analysis missed the mark in two ways. First, its narrow focus did not encompass the entirety of Cagle's claims for negligence/malpractice and breach of contract. Second, it failed to address the Lawyer Defendants' arguments concerning choice of law.

---

[3] Under Oklahoma law, attorney's fees are not generally recoverable in the absence of a specific statute or contractual provision so providing. However, Oklahoma recognizes an exception in cases where a defendant has committed a tort or breach of contract causing the plaintiff to incur attorney's fees to protect her interest. *See, e.g., Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 181 (Okla. 2000); *see also* Restatement (Second) of Torts § 914(2) (recognizing similar exception to general "American" rule concerning fees).

-10-

Because choice of law is determinative, we begin there.  The Lawyer Defendants contend Texas law governs.  Under Texas law, they argue, a non-client beneficiary like Cagle is categorically barred from bringing a legal malpractice and breach of contract claims against them.[4]  Oklahoma law, however, is less clear on this issue.

Cagle claims, first, the Lawyer Defendants failed to preserve the choice-of-law issue, and second, Texas law should not apply.  But, as will be seen, the Lawyer Defendants did preserve this issue.  Moreover, as we explain, Texas law applies under Oklahoma's choice-of-law principles.

We review the district court's determination and interpretation of state law de novo.  *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009).[5]  In a diversity case, we "apply the substantive law of the forum

---

[4]     Texas, unlike Oklahoma, has not yet adopted § 914(2).  *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 119 (Tex. 2009).

[5]     In recent cases we have clarified a pure de novo standard of review applies only where the facts are undisputed.  *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1143 (10th Cir. 2009).  This is because we review the findings of fact the district court makes in connection with choice of law questions for clear error.  *Moses v. Halstead*, 581 F.3d 1248, 1251 (10th Cir. 2009).

Here, the district court made no factual findings concerning the choice of law issue.  But this omission does not require a remand. The *basic* facts concerning the choice-of-law issue, such as Cagle's state of residence or the telephone calls and visits to Oklahoma made by the Lawyer Defendants, are essentially undisputed.  We review *ultimate* findings on choice-of-law issues de novo.  *See U.S. Aviation Underwriters*, 582 F.3d at 1143-44 (analyzing and

(continued...)

-11-

state, including its choice of law rules." *Id.* (internal quotation marks omitted). Since Oklahoma is the forum state, we must determine what law it would apply to Cagle's claims against the Lawyer Defendants.

### 1. Breach of Contract Claim

The Lawyer Defendants contend Oklahoma law requires us to give effect to a choice-of-law provision in the contingent fee agreement Norris signed; it requires application of Texas law. While Oklahoma generally follows the rule of *lex loci contractus*–under which a contract is governed by the state law where it is made– contracting parties may select another state's law as part of their agreement. *See Harvell v. Goodyear Tire & Rubber Co.*, 164 P.3d 1028, 1033-34 (Okla. 2006) ("[I]n Oklahoma, the established choice of law rule in contract actions known as *lex loci contractus* is that, *unless the contract terms provide otherwise*, the nature, validity, and interpretation of a contract are governed by the law where the contract was made.") (emphasis added) (footnote omitted).

---

[5](...continued)
weighing factors of "most significant relationship" test on appeal, reaching different conclusion than district court). Thus, we are able to do the choice of law analysis, complete with ultimate findings, based on the undisputed facts.

    Additionally, having determined the correct choice of law, we may then apply that law to summary judgment issues, even if our conclusions concerning the applicable law differ from those of the district court. In exercising our de novo review, we may affirm summary judgment for any basis that appears in the record, whether or not relied on by the district court. *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1150 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 1528 (2009).

    Applying Texas law, Cagle's claims against the Lawyer Defendants (with the possible exception of her negligent misrepresentation claim) simply fail.

The relevant provision in Norris's contract with the Lawyer Defendants reads as follows:

> This Agreement shall be construed under and in accordance with the laws of the State of Texas, and the rights, duties and obligations of Client and of Attorney regarding Attorney's representation of Client and regarding anything covered by this Agreement shall be governed by the laws of the State of Texas.

Aplt. App., Vol. III at 1183.

Cagle vigorously disputes the applicability of this provision. As her first line of defense, she argues the Lawyer Defendants waived the "Texas law applies" argument. She presents three propositions to support the alleged waiver. First, she contends the application of Texas law is an affirmative defense the Lawyer Defendants should have raised in their answers to her complaint. *See* Fed. R. Civ. P. 8(c) (requiring party to "set forth affirmatively" its affirmative defenses). We disagree. The Lawyer Defendants' choice-of-law argument was merely part of their general defense – they were not liable to Cagle because she was not their client. It was not an independent affirmative defense or basis for dismissal. The Lawyer Defendants raised a "lack of privity" defense in their answers, *see* Aplt. App., Vol. I at 78, 317, and that was sufficient to preserve the component elements of the defense, including the contention Texas law governs its outcome. *See, e.g., Wisland v. Admiral Beverage Corp.*, 119 F.3d 733, 737 (8th Cir. 1997) ("The rules do not require a party to plead every step of legal reasoning that may be raised in support of its affirmative defense; they only

require a defendant to state in short and plain terms its defenses to a plaintiff's claims.").

Cagle also finds waiver in the Lawyer Defendants' failure to mention Texas law in their portion of the Joint Status and Discovery Report. But the record shows they *did* mention the issue in that Report. *See* Aplt. App., Vol. VIII at 3118 (stating "[t]he scope of the lawyers' representation was defined by a written agreement which . . . chose Texas law to govern any dispute.").

Finally, Cagle argues the Lawyer Defendants "never disputed [her] contention contained in her Motion for Partial Summary Judgment . . . that Oklahoma law applies to this case." Aplt. Reply Br. at 10. While the record does not contain their response to her partial summary judgment motion, the Lawyer Defendants did argue the choice-of-law issue extensively in their own motion for summary judgment, thus putting Cagle on notice concerning the issue. *See* Aplt. App., Vol. III at 1107-11 (arguing "TEXAS LAW APPLIES TO THE CLAIMS AGAINST THE LAWYER DEFENDANTS."). We conclude the Lawyer Defendants more than adequately preserved the choice-of-law issue for our review.

In her next line of defense, Cagle raises four arguments why the choice-of-law provision, even if not waived, does not apply to her claims. To begin with, she contends the district court should not have considered the contingent fee contract (containing the choice-of-law provision) as summary

-14-

judgment evidence, because it was (a) hearsay and (b) unauthenticated. We easily reject both these contentions. First, the contract was not excludable as hearsay. It constituted an act of legal significance between Norris and her attorneys, not a "statement" offered for its truth. *Schindler v. Seiler*, 474 F.3d 1008, 1010-11 (7th Cir. 2007); *Mueller v. Abdnor*, 972 F.2d 931, 937 (8th Cir. 1992). *See also* Fed. R. Evid. 801(a). Second, both the contingent fee contract and Norris's signature on it were authenticated by Hutson's sworn deposition testimony, presented to the district court. *See* Aplt. App., Vol. VI at 2349-53.

Cagle next argues the choice-of-law provision cannot be used against her because she did not sign the contingent fee contract. But even a non-party's contractually-based claims can be subject to a choice-of-law provision if her rights are completely derived from those of the signing party. *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1170 (11th Cir. 2009). That is plainly the case here. Cagle's breach of contract claim charges *Norris* "entered into a[n] employment contract for legal services with [the Lawyer] Defendants . . . to represent [*Norris*] in all proceedings on her behalf in connection with the Wyeth litigation and the structured settlement." Aplt. App., Vol. I at 12. *See also id.*, Vol. VIII at 3109 (similar language in Joint Status Report). Cagle's alleged contractual rights are entirely derived from those of Norris, who signed the contract. She is bound by the contract's choice-of-law provision.

Cagle next argues she should not be bound by the choice-of-law provision because there is no evidence the Lawyer Defendants ever signed the contract. Citing *In re Godt*, 28 S.W.3d 732, 738 (Tex. App.--Corpus Christi 2000, no pet.), she contends the Lawyer Defendants' failure to sign the contract makes its choice-of-law provision void. Texas law requires a contingent fee contract be signed by both the attorney and the client. *See* Vernon's Texas Gov't Code Ann. § 82.065(a). And none of the copies of the contract in the record contain the Lawyer Defendants' signatures. But Texas courts have held where the contingent fee contract has been signed by the client and fully performed but not signed by the attorney, the attorney can enforce its terms. *Chambers v. O'Quinn*, 305 S.W.3d 141, 152 (Tex. App.--Houston 2009) (arbitration provision); *Enochs v. Brown*, 872 S.W.2d 312, 317-19 (Tex. App.--Austin 1994). It appears the Texas courts would find the contingent fee contract, and its choice-of-law provision, enforceable by the Lawyer Defendants, even if not signed by them.

Finally, Cagle makes a partially meritorious argument. She contends the choice-of-law provision does not encompass all of her claims in the present action. We reject out of hand the first part of her argument: the choice-of-law provision only applies to an action seeking *construction of* the contingent fee contract. The plain language of the provision, while governing construction of the contract, also provides "the rights, duties and obligations of Client and of Attorney *regarding Attorney's representation of Client* and regarding *anything*

-16-

*covered by this Agreement* shall be governed by the laws of the State of Texas."

Aplt. App., Vol. III at 1183 (emphasis added). This language is broad enough to

encompass her contractually-based claim.

Cagle also argues, however, the choice-of-law provision does not apply to

her tort claims charging the Lawyer Defendants "were negligent in failing to

obtain and/or preventing the physical issuance of [the] annuity policy." Aplt.

Reply Br. at 13. These tort claims appear to fall outside the scope of the

contingent fee agreement. By its terms, the contract governed only Norris's

"claim for personal injuries and/or any other causes of action [she] may have

against Wyeth and any other potentially responsible parties" in connection with

her fen phen injury. Aplt. App., Vol. III at 1181.[6] We must therefore look

elsewhere in Oklahoma's choice-of-law rules for the law applicable to her tort

claims.

## 2. Tort Claims

Under Oklahoma's choice-of-law rules, "the rights and liabilities of parties

with respect to a particular issue in tort should be determined by the law of the

state which, with respect to that issue, has the most significant relationship to the

occurrence and the parties." *Hightower v. Kan. City S. Ry. Co.*, 70 P.3d 835, 842

---

[6]     Thus, for similar reasons it could certainly be argued Cagle's
"breach-of-contract" claim also falls outside the scope of the contingent fee
contract. But we need not address this problem, since her contractual claim fails
for other reasons.

-17-

(Okla. 2003) (internal quotation marks omitted).  This test, adopted from the

Restatement (Second) of Conflict of Laws § 145 (1971), requires the

consideration of four factors "according to their relative importance with respect

to a particular issue as follows: (1) the place where the injury occurred,

(2) the place where the conduct causing the injury occurred, (3) the domicile,

residence, nationality, place of incorporation and place of business of the parties,

and (4) the place where the relationship, if any, between the parties occurred."

*Id.* (internal quotation marks omitted).

We first address a threshold issue.  Cagle attempts to incorporate into this

analysis facts involving the Lawyer Defendants' representation of Norris in

connection with the fen phen litigation.  But this will not do.  Cagle's alleged

injuries did not result from the attorneys' representation of Norris against Wyeth

or their settlement of Norris's claims against Wyeth.  Rather, Cagle alleges a

separate injury relating to the attorneys' conduct in relation to the annuity

contract, procured after a settlement of the underlying litigation was complete.

Turning to the "most significant relationship" factors, the place of injury

plays only a minor role in this case.  Cagle was injured by MassMutual's refusal

to issue the annuity policy and to pay benefits under the policy.  The Lawyer

Defendants inform us MassMutual took these actions from its corporate offices in

Massachusetts, thus making Massachusetts the situs of the injury.  Cagle does not

argue otherwise.  But the fact the injury took place in Massachusetts is obviously

-18-

only fortuitous, and does not require application of the law of that state. *See* Restatement (Second) of Conflict of Laws § 145, cmt. "e" ("Situations . . . arise . . . where the place of injury will not play an important role in the selection of the state of the applicable law. This will be so, for example, when the place of injury can be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties[.]").

More important is the next factor, the place where the conduct causing the injury occurred. Cagle asserts the Lawyer Defendants failed to inform Norris of the need for execution of the Addendum and the UQAR; failed to get these documents executed and sent to MassMutual; and in fact affirmatively interfered with their execution and delivery to MassMutual. These alleged affirmative actions or negligent omissions were facilitated by telephone calls or fax transmissions in which the Lawyer Defendants participated from their offices in Texas. Although some of these calls or faxes were placed to Oklahoma, where Norris and Cagle resided, and though one or more of the Lawyer Defendants met with Norris on occasion in Oklahoma, nearly all of the alleged misconduct was generated or initiated from Texas. We therefore conclude this factor favors the application of Texas law.

The domicile, residence, and business location of the parties is not disputed. Cagle lives in Oklahoma and the Lawyer Defendants are headquartered in Texas. An argument can also be made the location of the relationship between

the parties involved both Texas and Oklahoma. Thus neither of these factors is dispositive. In any event, we conclude these factors are less important than the place where the conduct occurred.

There is one additional factor to consider. Cagle's claims allege misconduct and/or malpractice by attorneys licensed in Texas relative to an alleged duty they owed her in connection with an attorney-client relationship. "If the primary purpose of the tort rule involved is to deter or punish misconduct . . . the state where the conduct took place may be the state of dominant interest and thus that of the most significant relationship." Restatement (Second) of Conflict of Laws § 145, cmt. "c."[7] *See also Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1535-36 (10th Cir. 1996) (applying Colorado substantive law to alleged attorney negligence by Colorado attorney occurring in Colorado, though victim was Florida citizen doing business in Michigan). *Cf. Hoiles v. Alioto*, 461 F.3d 1224, 1232 (10th Cir. 2006) (noting California's interest, for purposes of most significant relationship test, in enforcing California rules regulating contingent fee agreements prepared by California attorneys). Thus, taken as a whole, the Restatement factors favor the application of Texas law to Cagle's tort claims.

---

[7] Oklahoma has not adopted this language from comment "c" to Restatement § 145; however, we believe the Oklahoma courts would find the comment's reasoning persuasive.

-20-

## B. Application of Texas Law

We now proceed to apply Texas law to Cagle's claims against the Lawyer Defendants. It is plain under Texas law Cagle cannot maintain these claims. She was not the client of the Lawyer Defendants, Norris was. Texas law recognizes a "privity barrier," under which "an attorney owes a duty of care only to his or her client, not to third parties who may have been damaged by the attorney's negligent representation of the client." *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996). With particular relevance to this case, the Texas Supreme Court has refused to recognize an exception to the privity barrier in favor of beneficiaries of a deceased's estate planning arrangements. *See id.*

Though the *Barcelo* decision involved a will and a trust rather than an annuity contract, its reasoning applies squarely in this case. The problems are the same regardless of the beneficial vehicle involved. They involve ambivalence and the difficulty courts experience with line-drawing. Simply put, an unexecuted document "may express the testator's true intentions, lacking signatures solely because of the attorney's negligent delay. On the other hand, the testator may have postponed execution because of second thoughts regarding the distribution scheme." *Id.* at 578. In light of these concerns, Lone Star judges have sought to avoid befouling their boots by fencing off altogether the messy fields of donative motive.

Nothing here suggests Norris had second thoughts about naming Cagle as a beneficiary or procuring the annuity contract. But even where the testator's intent is clear, the Texas Supreme Court has been categorically unwilling to sanction a malpractice action against attorneys by disappointed beneficiaries arising from an attorney's failure to insure execution of documents prior to the testator's death. The Texas Supreme Court has confessed its inability "to craft a bright-line rule that allows a lawsuit to proceed where alleged malpractice causes a will or trust to fail in a manner that casts no real doubt on the testator's intentions, while prohibiting actions in other situations." *Id.* The court cited what it viewed as real dangers of permitting such an action: disappointed beneficiaries might sue estate planning attorneys for failure to receive a bequest, thereby embroiling the courts in a morass of extrinsic evidence; estate planning attorneys might find their loyalties divided between clients and their presumptive beneficiaries; and recognizing such an action could potentially create greatly expanded and unjustified liability for attorneys to disappointed beneficiaries. Finally, the *Barcelo* court specifically foreclosed recovery on contract as well as tort principles. *See id.* at 579 (rejecting contract-based action by beneficiaries as inconsistent with Texas malpractice law).

As a fallback position, however, Cagle contends the Texas privity barrier should not apply to her claims against the Lawyer Defendants, because even under Texas law, an attorney may owe a duty to a non-client under negligent

-22-

misrepresentation principles. Although the Texas courts do recognize a separate claim for negligent misrepresentation by a non-client beneficiary, they have made it clear such a claim does not fall under the rubric of legal malpractice:

> [A] negligent misrepresentation claim is not equivalent to a legal malpractice claim. Under the tort of negligent misrepresentation, liability is not based on the breach of duty a professional owes his or her clients or others in privity, but on an independent duty to the nonclient based on the professional's manifest awareness of the nonclient's reliance on the misrepresentation and the professional's intention that the nonclient so rely. Therefore, an attorney can be subject to a negligent misrepresentation claim in a case in which she is not subject to a legal malpractice claim.

*McCamish, Martin, Brown & Loeffler v. F.E. Applying Interests*, 991 S.W.2d 787, 792 (Tex. 1999) (citations omitted).

Such a claim for negligent misrepresentation is based on the Restatement (Second) of Torts § 552. *See McCamish*, 991 S.W.2d at 791-92. The Restatement test provides:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1).

The Texas Supreme Court has described the four elements of a cause of action for negligent misrepresentation under this Restatement test as follows:

-23-

> (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991).

This test requires, among other things, that the defendant supplied false information on which the plaintiff reasonably relied, causing her to suffer pecuniary loss. But Cagle identifies no affirmative false representation the Lawyer Defendants made to her. She mentions Ms. Hutson's suggestion that Norris structure part of her settlement, and Hutson's referral of Norris and Cagle to TJSG for this purpose. Neither of these communications, however, represents a false statement or representation to Cagle (or Norris, for that matter).

Cagle also points to the Lawyer Defendants' alleged failure to notify her and Norris of the need for Norris to sign the Addendum and UQAR to obtain issuance of the annuity contract. "Where there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts." *Brown & Brown of Texas, Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App.--Houston [1 Dist.] 2010, pet. filed) (quotation marks omitted). The problem is, Cagle has failed to show the Lawyer Defendants had any duty of disclosure *to her*.

"A duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole

truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression." *Id.* (quotation marks omitted). The first scenario does not apply; the Lawyer Defendants owed fiduciary duties to Norris, not Cagle. The other scenarios assume a representation by the Lawyer Defendants to Cagle concerning the requirements for issuance of the annuity contract that was either incomplete, misleading, or untrue. But Cagle points to no such representation by the Lawyer Defendants. In fact, the evidence shows Hutson did not discuss with Norris or Cagle what documents would be needed to obtain the annuity; she left that issue for TJSG to discuss with them. *See* Aplt. App., Vol. V at 1866. Therefore, Cagle has failed to establish a cause of action for negligent misrepresentation against the Lawyer Defendants.

### 3. Claims Against TJSG

Cagle cites nine separate TJSG failings she contends were negligent and/or constituted a breach of contract. Again, keeping our eye on the ball, it was Norris, not Cagle, who contracted with TJSG to obtain an annuity using Norris's settlement proceeds. Even assuming TJSG owed contractual or tort duties to Cagle as beneficiary of the Norris annuity and applying Oklahoma law, as Cagle urges, she fails to show TJSG breached any legally-recognized duty to her.

-25-

Cagle contends TJSG (1) failed to send the Addendum and UQAR to Norris on a timely basis for signature; (2) sent the Addendum to the wrong address; (3) misrepresented to Norris her annuity was finalized and failed to tell her she would be required to sign additional documents; (4) failed to notify Norris she should keep TJSG apprised of any change of address; (5) sent the Addendum and UQAR to Norris by second-day UPS without requiring a signature receipt; (6) failed to follow up with UPS concerning Norris's receipt of the shipment, or lack thereof; (7) failed to send the documents to Norris via the United States mail, by which they would automatically have been forwarded to her new address; (8) failed to email the documents to Norris; and (9) told Cagle when she called from the hospital on September 19, 2006, everything was done on Norris's annuity contract when, in fact, the paperwork was not completed.

These allegations can be divided into three categories: (1) TJSG's failure to notify Norris of her need to execute the Addendum and UQAR; (2) TJSG's failure to provide Norris with the Addendum and UQAR before she died; and (3) TJSG's alleged misrepresentation to Cagle everything was done on Norris's annuity contract. Cagle clearly cannot recover for the first category of alleged wrongs under either tort or contract principles. Norris's attorneys were well aware the Addendum and UQAR remained to be executed. Norris thus had notice of the remaining requirements for issuance through her agents, the Lawyer Defendants. Given this notice, TJSG had no duty to notify her personally. *See Renberg v.*

-26-

*Zarrow*, 667 P.2d 465, 471 n.16 (Okla. 1983) ("In the absence of fraud, notice or knowledge of attorney acquired during scope of employment is imputed to the client.").

Turning to the second category of alleged wrongs, any delay in sending the documents to Norris was also occasioned by the Lawyer Defendants, not TJSG. Clark instructed TJSG to wait until the annuity funded and MassMutual made the first payment before sending the documents to Norris. Once this occurred and Clark gave TJSG the go-ahead, it promptly sent the remaining documents to Norris for execution.

The second category of alleged wrongs, however, also includes TJSG's purported failure to insure the documents, once expedited, actually reached Norris on a timely basis. It is undisputed TJSG sent the documents to Norris's last known address by UPS two-day mail, where they were delivered on the very day Norris entered the hospital. Neither Cagle nor Norris notified TJSG of their new address. Within two weeks of entering the hospital, Norris unexpectedly died. Although TJSG appears to have been aware Norris's condition was incurable and could eventually be terminal, Cagle cites no evidence suggesting TJSG was aware Norris's death was imminent when they sent the documents to her to be signed. While Cagle has suggested a number of measures TJSG might have taken to be certain Norris would receive the documents, she fails to show either TJSG's contractual duties or any duty of reasonable care required TJSG to undertake any

-27-

of these measures under the circumstances presented here. Arranging an expedited delivery by a reliable envoy to Norris's address of record is sufficient.

In general, an insurance broker's duty to its clients requires only it "act in good faith and use reasonable care, skill, and diligence in the procurement of insurance[.]" *Kutz v. State Farm Fire & Cas. Co.*, 189 P.3d 740, 744-45 (Okla. Civ. App. 2008). Assuming such a duty extends to the procurement of an annuity policy, and taking the facts as presented by Cagle as true, she fails to show a lack of good faith, reasonable care, skill, or diligence on TJSG's part in obtaining Norris's signature on the UQAR or the Addendum should result in TJSG being liable to Cagle.

Cagle also contends she telephoned an unnamed employee of TJSG on an unspecified date and time during Norris's hospital stay. This employee allegedly stated with respect to the annuity "Everything looks done to me." Aplt. App., Vol. VII at 2845 (depo. p. 283). This vague statement by an unspecified person is insufficient to create a genuine issue of material fact concerning a breach of duty by TJSG to Cagle.

Finally, in addition to the nine specified alleged failings by TJSG connected with issuance of the annuity prior to Norris's death, Cagle complains TJSG acted affirmatively to prevent the physical issuance of the annuity policy after Norris's death. She cites two instances of this alleged interference: (1) TJSG's instruction to MassMutual to "hold payments," *id.,* Vol. I at 249; and

(2) notes from a conference between Clark and Jeanie McIntyre of TJSG indicating they decided to suspend communications with Cagle's attorney, to "do nothing" and to "hold tight on getting [the] pol[icy] issued -- don't get issued," *id.* at 283. The undisputed evidence does not support Cagle's characterization of these events.

TJSG made the request to "hold payments" after Norris died, pending receipt of her death certificate. Charlene Galt, an underwriting consultant with MassMutual, testified the holding of payments is the company's standard procedure when MassMutual is notified of the death of an annuitant. Aplt. App., Vol. IV at 1634. In fact, a hold on payments would have been imposed even if MassMutual had in hand all the documents necessary to have issued the annuity policy. *Id.* at 1635. We discern no breach of duty on TJSG's part in requesting MassMutual to follow its own standard practices.

The Clark/McIntyre conference notes, taken in context, refers to TJSG's discussions with Clark about how to handle what looked to be a burgeoning conflict between Cagle and her attorney and the potential beneficiaries of Norris's intestate estate over the validity of an entitlement to the annuity. After noting Oklahoma does not recognize same-sex marriage, the parties concluded there was an "issue" over "whether [the] annuity [had been] formally completed." *Id.*, Vol. I at 283. In light of this ambiguity, they were "afraid" of having "mom & sibling[s] come back to us." *Id.* The parties therefore agreed they should not deal

with Cagle's attorney but should instead wait for issuance of "letters of testimony" that would confirm the authorization of the holder to "talk on her behalf as if serving Shavon Norris." *Id.* Noting the "Company [was] paying [the] annuity," the parties to this conversation decided to "do nothing" and to "hold tight on getting [the] pol[icy] issued." *Id.* They would not "get" the policy "issued." *Id.*

Even if this exchange discloses a breach of duty to Cagle, we discern no damages to her caused by the defendants' decisions about how to handle the conflict between Cagle and the beneficiaries of Norris's estate. The evidence indicates it was MassMutual's decision to suspend payments and not to issue the annuity contract. MassMutual knew Cagle was the beneficiary named in the policy. Its usual procedure in such cases would have permitted Cagle to execute the Addendum and UQAR even though Norris had died without executing them herself. *See id.*, Vol. IV at 1600-02. But--and this is crucial--MassMutual did not offer Cagle this option, because "we realized there was a litigation and possibly competing claims." *Id.* at 1602.

Given MassMutual's concerns about litigation, Cagle fails to identify any action TJSG could have taken after Norris's death that would have persuaded MassMutual to change its mind.[8] While the district court eventually decided the

---

[8]    TJSG apparently made at least one additional effort to get the policy issued with the documents it had. On January 19, 2007, it faxed the settlement

(continued...)

annuity contract was valid even without Norris's signature on the Addendum and UQAR, it took the very litigation about which Cagle complains to settle the matter, because MassMutual insisted on a court decree that would insulate it from liability before issuing the policy.

## CONCLUSION

The record discloses no genuine issue of material fact concerning whether the Lawyer Defendants and TJSG are liable to Cagle on her claims of breach of contract or negligence/malpractice, and they are entitled to judgment on these claims as a matter of law. The district court therefore properly granted summary judgment to the Lawyer Defendants and TJSG. The judgment of the district court is AFFIRMED.

Entered for the Court

Terrence L. O'Brien
Circuit Judge

---

[8](...continued)
agreement signed by Norris and a Uniform Qualified Assignment to MassMutual, asking whether "MassMutual will issue the annuity contract for this matter based on the attached documents." Aplt. App., Vol. II at 526. MassMutual responded "no." *Id.*